Case number 25-7129, Shana Hargrove as power of attorney for Kevin Welch Appellant v. MedStar Washington Hospital Center at Audience. Mr. Jackson for the appellant, Mr. Navarro for the appeal. Good morning. Mr. Jackson, you may start. May it please this Honorable Court, Counsel, This appeal is to Dr. LaKeel, in turn, in part, on his familiarity with the medical procedures at issue in the case. And in making its ruling, the lower court looked at Dickerson v. District of Columbia, in which one of the experts, and this was an issue on appeal, was a toxicologist. That particular expert opined, and this was one of the issues that the court was looking at closely, as to whether or not the adverse effects of a pinched nerve on the performance of a field sobriety test was, in fact, enough to make a finding of proximate causation based on how the litigant performed on that field sobriety test. In that case, the court stated that the familiarity of the expert was deficient because the expert never demonstrated the field test under any type of supervision, was never formally trained or certified in administering such a test, and never witnessed the test being administered in a law enforcement proceeding. And as to the proximate cause opinion of the expert, the court found that the proximate cause basis was deficient and that even though the expert had qualifications in anatomy, in physiology, in these other areas of science that go to determining whether or not there is a neurological effect on the performance of the sobriety test, that there were articulable reasons to doubt the competency of the expert. Dr. Elakil, despite the impressive nature of his qualifications, is not simply and did not simply before the lower court rely on his qualifications alone to state and underguard his opinion regarding proximate causation. And let me give the court some background analysis about the complication at issue here. As you understand from reading our briefs, the issue here is whether or not the stroke was timely detected after the type A aortic dissection was performed on Mr. Welch. The dissection itself, as we noted too, performed by a cardiothoracic surgeon was performed without complication. As our expert Dr. Shulman stated, once that patient goes over into postoperative care, the duty of the cardiothoracic surgeon subsides. He is then under the care and watchful eye of the internal care unit team, and that is who the named defendants were in this case, in terms of whether or not there is an efficacy window that can be met in diagnosing the stroke that happens after a type A aortic dissection. Based on literature, based on the testimony, even of Dr. Elakil, based on his clinical experience, these types of strokes following TAD, what we'll call TAD for shorthand, as we do in our briefs, are very rare, occurring in less than approximately 5% of these types of surgical cases. So even the field within which a neurosurgeon or even a cardiothoracic surgeon can get experience is very limited by the nature of the risk profile that this type of complication occurs under. When the cardiothoracic patient goes from surgery into post-op care, maybe the surgeon follows up, maybe not, maybe it's ER docs, but the one doctor whom you wouldn't expect to be caring for the post-cardiosurgical patient in the ER is a neurosurgeon. I would respectfully disagree, Judge Katz. Why? Because, as Dr. Elakil explained, the performance of the placement of a lumbar drain, first there were a few medical procedures at issue that Dr. Elakil applied, some interventions that should have been taken. There should have been blood management loading, and there should have been a consideration of the placement of a lumbar drain. And the lumbar drain is probably the most significant intervention out of all of those we've discussed in our brief because of the efficacy window being so high and the rate being so high for success out of the other interventions listed. Did Dr. Elakil say it was the most significant? Or did he keep talking? I thought he kept talking about the sort of suite of measures they should have undertaken. There were a suite of measures, but the peer-reviewed literature that Dr. Elakil relied upon, and I understand counsels takes quite, and even the court below, took issue with some of even the relevance of those procedures, but even those procedures talk heavily about the- In his statement and his deposition said, as you just said, that lumbar drain is most important. I believe that was the nature of his opinion, that out of all- That's the nature of his opinion. I'm asking whether he, as an expert you put forth, opined that that was the most effective. I thought he was opining that you needed to have this sort of suite of measures, including blood pressure management and heavy loading, I guess, of fluids or whatever, although I assume that's blood pressure management, but that and the lumbar drain. He opined that the health care providers should have considered the suite of interventions because there's no documentation in the record that they did, but he did opine that out of those suite of interventions, that the most likely one to allow Mr. Welch to achieve either partial or complete recovery was the placement of the lumbar drain, and that was really where the conflict occurred during his deposition, and even in their brief was his experience, particularly with- Where did he say that the lumbar brain was the one most significant for this, that would have been most significant for this patient? If I know you can get me on rebuttal, I don't want to waste your time. I will reach on that in rebuttal. Okay, thank you. Going back to, quickly, the familiarity with which Dr. Ellakil stated, he did testify that, based on his clinical experience, he had seen a partial improvement with the placing of a lumbar drain, management of blood pressure goals in patients after TAD procedures, just like Mr. Welch, and also testified that he had performed neurosurgery from 2020 to 2021 in a cardiopulmonary surgery department where TADs were performed. As to the placement of the lumbar drain, the lower court, we feel, discounted Dr. Ellakil's testimony where he cited having placed such a drain with a TAD procedure patient and achieving a partial improvement in their clinical practice. The lower court also found that Dr. Ellakil's methodology was unreliable, largely because he did not examine Mr. Welch, he did not consider certain records from 23 and 24, and that he relied on peer-reviewed literature, which the district court, some of which, most of which, described as irrelevant. As to the lack of personal examination and the review of records, Judge Rogers, writing for this court's majority in Ambrosini v. Lerberoch, dealt squarely with the issue of pointing to the limits of research taken on the issue of causation based on that proffered expert, a teratologist, not taking family clinical history or ordering more advanced chromosomal studies before opining on specific causation regarding Deprovera and the cause of birth injury. And the judge in that case, Judge Rogers said, that tactic of pointing out the limits taken by a particular expert goes to the weight and not the admissibility of that particular expert's testimony. Likewise, this court- Isn't this a little different here because he's testifying to proximate causation, but he didn't even know what had been caused, right? Right, he was testifying to all kinds of physical problems that Mr. Welch doesn't have. I'm sorry, Dr. Elekeel was testifying? Well, that's what he wanted to testify to. His causation was all about bladder problems and gait problems, and those aren't things that he- those are not his permanent injuries. No, his permanent injuries, first, two issues, Your Honor. Dr. Elekeel was testifying about the neurological deficits of Mr. Welch. There was some discussion in the brief, I believe, by counsel stating that, well, Mr. Welch is fine. He's walking around. He can walk upstairs. He can perform all of these functions. His ADLs aren't affected. But Dr. Elekeel, what he is addressing in his opinion, and this was even talked about- The expert designation JA-301 says he will speak to the causation of Mr. Welch's, quote, current severe outcome of lower extremity weakness bowel and bladder dysfunctions, which he doesn't have. That was the designation. That was not Dr. Elekeel's opinion. The designation, which all of you are familiar with the rules, occurs way early at the outset of the litigation, even before any fact depositions were taken in this case. As to his actual report and opinions in his deposition, Dr. Elekeel focused on the neurological deficit that is caused by the stroke, in and of itself, on the spinal cord. That's what's so critical about diagnosing it within that short window of time, following the procedure, the TAD procedure itself. And that kind of dovetails into the issue about the records, which is why Dr. Elekeel did not find them relevant for his review, because in coming up with whether or not the failure to diagnose approximately caused neurological deficit, you're really zeroing in on the date, which Dr. Elekeel testified, that the stroke occurred July 17th, and about a 10-hour window after that. We did designate, in our brief we have the plaintiff's designation, a vocational rehabilitation expert and a life care plan expert who did examine Mr. Wells and who did opine based on what he was able to do prior to the surgery and his current physical and neurological state. And we feel that that would have been an appropriate measure to take by a doctor qualified in vocational rehabilitation. It does not go to undercutting Dr. Elekeel's opinion. Just to make sure I understand the theory of liability, there's two counts in the complaint, right? A medical malpractice count and then a consumer protection violation count.  Which the court dispensed on. For the medical malpractice count, is the asserted injury that there is permanent harm, or is the asserted injury just that there was a stroke and that caused some harm, even if not permanent? I'm trying to understand. What is the theory of the case? Judge Wilkins, the theory of liability is this, that following the TAD procedure, when Mr. Welch was transferred to the ICU unit, upon his examination by the named defendants in the lower court case, based on the results of their examination, which showed weakening motor control deficits in his lower extremities, that there should have been a consultation, at the very least, with certified neurologists and or neurosurgeons to discuss the implementations and, in fact, intervene with the treatment, with the Penelope suite that we had talked about with Judge Millett, with either performing one of three interventions, placement of a lumbar drain, what's called blood management or satisfying a particular formula to determine the amount of oxygen that was appropriate to give Mr. Welch during that efficacy window, and also giving him an MRI. None of those interventions were done until approximately six days after the surgery. What our theory is that, and what Dr. Elakil's opinion is that, had any of those interventions been done timely and appropriately, and this is based on Dr. Elakil's clinical experience, as well as the peer-reviewed articles that he cites too, Mr. Welch's neurological deficits, as well as his physical deficits, would have been able to have been recovered either partially or completely, depending on the intervention chosen. Neither of which was done. And because those interventions – Permanent injuries that you're talking about? Permanent injuries, yes. Permanent – Only permanent. Permanent mental injuries, yes, permanent injuries. And because that was not done, that is why he sustained injuries. So the theory is not that those would have prevented the stroke. The stroke had already occurred. The stroke had already occurred. It was preventing the worsening effects of the occurrence of the stroke. That is what Dr. Elakil took issue with in terms of his review of the record. The articles I just want to point to briefly before I turn my lectern over, particularly with the delayed post-operative article, which according to the district court, while relevant, found that the article could not establish that a lumbar drain or blood pressure management would have prevented Kevin Welch from suffering permanent neurological deficits, because according to the lower court, the article only establishes that for one TAAD procedure patient, a lumbar drain provided partial benefit and no blood pressure management was necessary. However, as I've just stated, Dr. Elakil opined that the lumbar drain in particular would have provided either partial or complete resolution of the neurological and physical deficits of Mr. Welch. Moreover, in Ambronzini at 141, the court found that evaluating the persuasiveness of scientific studies such as the delayed onset article, conflates the questions of admissibility of expert witness testimony and the weight appropriately given to expert testimony. We think that is what the mistake was that the district court made below, is trying to look at the conclusions generated by Dr. Elakil's reliance on the articles rather than the methodology of Dr. Elakil relying on these articles themselves. We will give you a couple of minutes for rebuttal. Hopefully you can point me to where he talked about lumbar drains being the most significant measure, at least for this patient. Thank you, Your Honor. Okay, Mr. Pienaugle. Good morning. May it please the court. Pienaugle on behalf of MedStar Washington Hospital Center and the ICU providers. The district court's ruling on the motion to exclude Dr. Elakil's causation testimony reflects a textbook execution of his gatekeeping obligation under Rule 702 in the Daubert framework. Again, the primary objective of that rule is to make certain that an expert, whether relying on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Nothing about Dr. Elakil's causation opinion reflects intellectual rigor. The record, to the contrary, reflects an expert who has retained to develop a causation opinion for the purposes of litigation and did so with blinders on both ends of the analysis. On the front end, by disregarding causal factors with which he was unfamiliar, and on the back end, selectively considering and to the point of cherry-picking the records that he based his opinion upon. The district court put a lot of weight on this doctor not having the relevant expertise. Can you talk about that a little bit? I mean, you know, perfect fit might have been a neurologist who is expert in TAD surgeries and lumbar drains and in the ER looking at post-op patients, but that's a very narrow, very narrow slice. I mean, why is it not close enough to have a neurosurgeon addressing these stroke-related? Thank you for the opportunity to clarify that. I did want to touch on this given the arguments in the reply. The hospital's position is not that there's a – certainly not that there's a categorical or bright-line rule that you – the physician has to be within a particular specialty or have a certain board certification to testify as an expert, but it's also true that just by virtue of being a physician does not qualify that individual to testify in all matters in the subject. No, I know, but being part of the district court's analysis, these are questions of degree, and the district court reason alakil is not close enough to the relevant expertise. Well, so as I read it in light of the arguments that were made, it's not so much that, you know, his – the fact that he's a neurosurgeon was the issue, but while not dispositive, a physician's specialty is a pretty strong barometer as to the base of their knowledge, education, training, and experience. But he was a neurosurgeon who had actually performed the lumbar drain procedure, right? He had, and so notwithstanding the fact that he's not a cardiothoracic surgeon and the fact that this, I think, involves important questions – causal questions for which the fact of the type A aortic dissection surgery is pertinent. So, yes, I think he – so let me start over. He did have experience placing lumbar drains in TAD repair patients, but it was limited to the point where in the last five years he'd only done it once. And to the extent that he could recall, the only patient within that category that he could recall for only saw partial resolution and not complete resolution. But how does that mean, then, that he doesn't have relevant expertise? I mean, I don't think that we have some rule, or maybe you can point me to a case, where just because you've only done it once in the last five years, you don't have enough expertise on it to give an opinion. What's your best case for that proposition? Well, I think it's the Dickerson case, which is the principle, again, that you have to be familiar with the procedure at issue. And the district court touched on this, that there's some dispute over whether the TAD repair itself is part and parcel of the procedure at issue. And the medical literature that Dr. Ellicott is relying on indicates that it is, that there are features of this condition and the procedure to correct it that have the inherent capacity to cause not just spinal cord injury, but irreversible spinal cord injury. The extent of the repair, the duration of the arrest, the potential for hypertension due to false limb and thrombosis, these are all things that Dr. Ellicott candidly acknowledged that he has no insight into. He can't speak to how these spinal cord infarctions arise in this setting. He can just speak to spinal cord infarctions generally. So he can't address the very factors of the literature that he's relying on. Who can? A cardiothoracic surgeon would certainly be more qualified to. And this gets back to the point that it's not strictly necessary. Cardiothoracic surgeons are not experts in brain bleeds. No, they're not. And that's what the source of the injury here is, the dead tissue from the stroke and then the dead tissue and damage to the brain. So there's this. It seems odd to suggest that the only person that could have testified to this is someone who does heart-lung things when you're talking about spinal cord, brain. So if you. Somebody studying neurology, which, gosh, I hope every neurosurgeon knows neurology incredibly well before they go cutting in. I would disagree that the cerebral strokes are the focus of Dr. Ellicott's opinion. If you look at his report, he talks about the insertion of a cerebrospinal fluid drain. I'm just responding to you suggesting that someone who focuses on hearts and lungs is the only right expert to testify to spinal harms, including strokes that affect the brain. So what I'm. My point is that the causation. Is it a neurologist with that? Could that is that someone is that also an answer to Judge Wilkins question? A neurologist could have been a relevant expert. In theory, even a neurosurgeon could be a relevant expert. Well, that's a different answer. But the question is, what is their experience and how are they linking that experience to the opinions that they're proffering? And the opinion that Dr. Ellicott is proffering is that had a lumbar drain been placed or the failure to place a lumbar drain resulted in Dr. and Mr. Welch's injuries being permanent rather than likely temporary. What basis of his experience does he have to say that? To the extent that he could recall, there's one time in the last five years he's done this, and that patient did not see complete recovery. So how is he getting from that to Mr. Welch's would likely have been temporary? Well, that sounds like good cross-examination in district court. But the question is whether or not this should have been for a jury to decide. It's not whether they win. Respectfully, this juncture is whether or not the trial court abused its discretion, its assessment of the reliability. That's fine, but it's still, I mean, the arguments you're giving, the district court cannot exclude something because it will be subject to vigorous cross-examination. There's lots of reasons to think there's troubles with it, right? The person has the expertise, has done the procedure, and in fact has done the procedure in the very, very rare setting we have here following a TAD repair, then isn't everything after that for the jury to decide based on examination and cross-examination? Respectfully, Your Honor, I would strongly disagree in this case because the question is how is the expert? Because, again, it's the proponent of the testimony. In this case, it's the appellant's burden to demonstrate the reliability to connect the dot between the experience and the conclusion. And so how are we getting from a single instance in the last five years resulting in partial recovery to an opinion that it would likely have been temporary in this case if he'd done the same thing? But I don't think that what Daubert in Rule 702 says when they say that you have to have some sort of a reliable methodology that you have to be able to point to an exact, I guess, precedent where your opinion, someone before did something and it came out the same way that you are opining here. I mean, the whole point of focusing on principles is that they can say, well, yeah, the result might have been different in that case, but here's why applying the same principles that we can glean from that case, the result might be different here. You seem to be saying that in one way of reading the district court opinion, saying that unless he could find like an article or be able to say that there was an instance where there was no permanent damage, he's not allowed to give that opinion. I'm not even going to let the jury hear that opinion. And that seems to be taking Rule 702 a little bit too far. So I think, again, I would have to disagree, Your Honor. I think part of the problem is fact-specific to this case. The real elephant in the room here is that Dr. Elkhill, while purporting to opine that Mr. Welch has permanent injuries, that he has a severe outcome, that these interventions would have made a difference in terms of where he is now, didn't undertake to get the information that he admittedly needed to discern what Mr. Welch's now is. He didn't bother to perform a physical examination, absent which he acknowledged he could not say to what extent, if any, Mr. Welch currently has lower extremity weakness or review any of the recent physical examinations that his treatment providers have performed, indicating assessments that look an awful lot like complete resolution of lower extremity weakness. Wasn't he relying on the other experts or other evidence that the injuries were permanent? I mean, I guess all I'm saying is that why does this expert have to have examined the patient and given an opinion that they are permanent? Another expert could do that. This expert was a causation expert that says, assuming that they are permanent, they wouldn't have been permanent if this other intervention had been done. So, again, Your Honor, in theory, that could have happened, but it didn't happen. None of the plaintiff's experts performed an examination of Mr. Welch documenting permanent neurological injury in terms of low extremity weakness. The only witness who's opining on the permanency is Dr. Ellickeel from a causation standpoint. And he does not – this isn't something that the hospital is cultivating out of whole cloth. This is Dr. Ellickeel's testimony at the position testifying, I don't know what his current condition is. I did not examine him. It's hard to say without a medical examination to what extent, if any, he has currently any lower extremity weakness. So this is the expert himself admitting that he, in effect, does not have an adequate factual basis for the opinion that he's proffering. And it incidentally coincides with his own prior clinical experience, which, again, while limited, it includes a single instance of, you know, a patient similar to Mr. Welch, interventions similar to the ones that he's proposing, and an outcome that, if anything, seems – Maybe I'm misunderstanding the record. I thought that Dr. Ellickeel had been presented with evidence either from an expert or just factually from the patient on medical records that there was permanent injury. I mean, I guess what I'm saying is that if the theory of liability requires there to be permanent injury, you don't need to exclude the expert to win. All you've got to do in summary judgment is say they haven't presented enough evidence to have a reasonable trier of fact find that there was a permanent injury. And that's a whole lot simpler and more straightforward and easy way to win on summary judgment than knocking out the expert. But I didn't understand that to be your argument below. The argument, right, I mean, it certainly wasn't presented that way. But, I mean, the fact of the matter is that there's really not much daylight, under the circumstances of this case, between this sort of partial improvement notion and complete resolution. If you look at his assessments, they're describing full strength and mobility. He's completely independent with activities of daily living. I think they acknowledge there are still neurological deficits with speech, motor control. So, again, just to circle back to this notion that the cerebral strokes are part of Dr. Ellickeel's opinion, if you look at Dr. Ellickeel's report, it's fixated exclusively on the proposed capacity for a lumbar drain to result in improvement of the spinal cord infraction symptoms, which, again, are the lower extremity weakness. It has nothing to do with the cardioembolic strokes in the brain, which Dr. Ellickeel describes as being related to blood clots being sent to the brain. So the cerebral strokes aren't related to the intraspinal pressure, which is a mechanism that's a focus by which the lower extremity weakness could have been improved. So the cerebral deficits are not, to the extent that there's a suggestion that there's a causation opinion offered by Dr. Ellickeel related to the cerebral strokes, and that's a hollow notion. The record doesn't include any such opinion. How are we as a court to know and articulate when the district court has crossed the line from reasonably, you know, where it's really an argument about weight rather than admissibility? How do we articulate that? What case helps us understand where that boundary is? That's a good question, Your Honor. I think that I would have to, as I stand here, come up with a hypothetical as it relates to this case. I mean, an instance in which the trial court is evaluating the credibility of the expert as opposed to the reliability of the expert, this would be the quintessential instance of a failure to apply the gatekeeping requirement correctly. But certainly not the case here. This is, again, I'm maintaining sort of a textbook, methodical, reasonable evaluation of the articulated basis for the proffered opinion. Going through the limited tangential personal clinical experience of the expert, what the district court described is, I think, fairly grossly deficient review of the medical records, to the point of cherry-picking ones that supported his conclusion while ignoring the ones that were inconsistent with it, and then relying on literature, which, again, is not only outside the scope of his expertise. These are not neurosurgery journals. These are thoracic surgery journals. And even if that weren't the case, they don't say what Dr. Elkill described them as saying in the deposition. They don't say many cases indicating that the placement of lumbar drain will result in complete resolution of symptoms. So, I mean, deference is the hallmark of the discretionary standard. There's nothing unreasonable about how the district court assessed the reliability of Dr. Elkill's testimony. I just have one quick question. So MedStar Hospital Center is wholly owned by MedStar Health, right? Yes. Is the primary place of business for MedStar Health Maryland? MedStar Washington Hospital Center? No, MedStar Health that wholly owns the hospital center. I would have to ask. Kindly, I do not know. Okay. So I'm just trying to figure out which of these two entities' location we're supposed to consider for purposes of diversity. The point hasn't been litigated below. Does the hospital center have its own sort of executives in the hospital, located in the hospital in D.C.? I would have to check, Your Honor. I don't want to give you incorrect information. Okay. So I'm just trying to understand the follow-up on Judge Millett's question. The defendant that was named in the complaint, maybe it got amended later, but was MedStar Washington Hospital Center, was at least in the initial complaint. I don't know if there was a change in the amended complaint. But that's not an entity that can sue or be sued. That's just a trade name, is my understanding. At least in looking at the corporate registrations last night online for D.C., that's registered as a foreign trade name in that the entity that owns the trade name is Washington Hospital Center. That's an actual corporation that can sue or be sued in that Washington Hospital Center is a Delaware corporation. Whether Washington Hospital Center is, in turn, a subsidiary of something else, I don't know. I didn't go that far down the rabbit hole. But it appeared to me that MedStar Washington Hospital Center isn't even a real entity. It's a trade name for Washington Hospital Center, which is a real entity. Do I have at least that much correct? Again, I wish I could answer, Your Honor, more directly. I'm happy to file something supplemental answering that question. But I don't want to give the court incorrect information. I didn't review the corporate structure. I'm not trying to be flip. It's not top of mind, and I don't want to give the court the wrong information. I'm happy to file something supplementary addressing that. We have to verify that the federal court has jurisdiction, diversity jurisdiction in this case. I'm happy to help in that regard. I didn't understand to be at issue, but I will file something supplementary addressing it. Okay. Thank you.  Thank you very much, counsel. Thank you. Mr. Jackson, we will give you two minutes for rebuttal. Thank you, Your Honor. Very briefly, to go directly first to Your Honor's question from my prior discussion, you had asked where in the deposition Dr. Ellaciel discusses that the lumbar drain placement would have been the most beneficial to Mr. Welch. I'd refer the court to pages 77 and 78 of his deposition. Where in the JA is that? I'm sorry? What page of the joint appendix is that? Is it JA 77 that you're talking about, or is that the page of the transcript itself? That would be the page of the transcript. I do not have the JA site, Your Honor, unfortunately. It looks like 77 is on JA 79. Sorry, which page did you say it's on? It includes 77 through 78 based on my reading of the transcript in terms of his discussion of the article related to the spinal cord ischemia management. In that particular article at page 74 and 75 of that article, it states that in general the approaches to mitigate the risk of SCI, spinal cord infarct, include avoidance of hypertension, maintenance of optimal oxygen delivery, as well as a selective addition of invasive adjuncts such as the use of a lumbar spinal joint. Are you quoting from him right now? I'm sorry? Are you quoting from him right now? No, I was quoting from the article on which he was relying. I want to quote from what did he say? The article wasn't talking about this patient. No. What did he say? The lumbar spine was the most lumbar drain. He does not use those words. The lumbar drain was the most efficace or important for this patient, Your Honor. I don't want you to look for the transcript for those words. My understanding when giving you that cite was his explanation in reference to the article from which I was just reading where he was basing the opinion of the efficacy of the lumbar drain. In that particular article, which is — I think these are different. You're on different pages than we are. So it looks like, sorry, is it 449, maybe? Okay. I think 449 and 450 looks like would be pages 77 and 78 of his deposition. But does he ever say that's what would have been most important for this patient, or was it the combination of measures? He doesn't say both respectfully, Your Honor. That's what I wanted to clear up. He does not say, black and white, the lumbar drain should have been used for this patient. What I'm saying is that his preference is for the efficacy of the lumbar drain based on his review of that particular spinal cord ischemia article. I did want to correct one misrep—what I feel is a misrepresentation the counsel had made about there being no experts that examined Mr. Welch. As I said in my opening remarks, Dr. Richard Kaplan did examine Mr. Welch over a period of four hours, did provide a report which we submitted timely in conjunction with our expert preliminary designation, which discusses that examination in full. Your Honor, Judge Wilkins, you had asked counsel which particular case would suggest that we not go so far as the district court is suggesting that we go in application of 702. I think this court leads to look no further than the Daubert case, which says that the dispositive question in dealing with expert witness testimony is, will it assist the trier of fact to understand the evidence or determine a fact of issue, not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial, which is what they're trying to, I believe, do by continuously bringing up the fact that Dr. Ellakil can't point definitively to whether or not— There's a distinction here where D.C. law requires that you have an expert testify on medical malpractice cases, including on every element, so including the element of causation. So it seems to me then the qualification of the expert to testify about causation is one and the same with your burden of proving causation. No, it's not the same as the burden of proof of causation. In District of Columbia v. Anderson, the court was clear that it is the actual qualifications of the witness that count, not their title, and it's the specialization and training of the witness that go to the weight and not the admissibility of the opinion of the expert. But then, I mean, it's the only way you can prove causation is with expert testimony. That is correct. That is correct. You do have to have expert testimony to prove causation in medical malpractice. The other thing I wanted to just hit on before I close is that, yet and still, we feel, I feel on behalf of my client, that the defendants in this case have still not articulated reasons to doubt Dr. Ellakil's competency with respect to his familiarity, and that is what would be required. They continue to refer to, well, in the past five years, in the past three years, he's done X, Y, and Z. This isn't Maryland where, for example, to file a medical malpractice action, you have to produce an expert report by an expert who has, within the last five years from the date of injury, performed or been familiar with the case at issue. In that case, it's clear. That's the goalpost. That's the standard. And there have been tons of cases in Maryland. That's the whole jurisprudence of medical malpractice law, almost dealing with these certificates of qualified expert, where if they don't meet that five-year window, no matter their qualifications, no matter their training, no matter their specialty, they cannot apply. That is not the case here. We feel that Dr. Ellakil has met all of the burdens required for him, and we would ask for a reverse remand in this case. Thank you, Your Honors. Thank you very much, counsel. With that, thanks to both counsel. The case is submitted.
judges: Millett; Wilkins; Katsas